**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 25-CR-220-ABJ** |
| | **:** | |
| **RARKEASE CHARKES BISHOP,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Despite every advantage—a stable upbringing, financial support, and access to educational and vocational opportunities—the defendant has made a deliberate and repeated choice to engage in criminal conduct. And what makes matters worse is that defendant's unlawful activity is only escalating as he matures in age.

On the offense date, the defendant fled, unprovoked, from police in a vehicle and on foot. After being placed in handcuffs, the defendant continued to resist and attempted to escape. Only after officers subdued him was the full danger revealed: a loaded firearm with a large capacity magazine from the defendant's pant leg. Critically, the defendant committed this offense while on supervised release for a prior gun conviction, demonstrating not just disregard, but outright contempt for court-imposed conditions and the law itself.

The defendant has been given multiple chances—through several lenient sentences—to conform his behavior to the law, and he continues to squander those opportunities. This Court is now confronted with a defendant who has proven, through his actions, that he will not comply, will not reform, and will continue to pose a danger to the community if not incapacitated. Accordingly, the United States requests a sentence of 37 months of incarceration followed by three years of supervised release.

1

## I.    FACTUAL BACKGROUND

On July 16, 2025, at approximately 3:17 p.m., members of the Metropolitan Police Department's ("MPD") Sixth District Crime Suppression Team ("CST") were patrolling the 100 block of 42nd Street Northeast in Washington, D.C. Officer Suarez and Officer Johnson, who were part of this active patrol, observed the defendant walking in the area. Officer Johnson also observed that as the defendant walked by their marked police cruiser, he continuously looked back in law enforcement's direction.

Shortly thereafter, Officer Schemmel and Officer Moore observed a White Nissan Maxima with a Maryland Registration (2GB7398) (the "Nissan") with no front license plate around 100 42nd Street Northeast, Washington, D.C. Officer Moore, who had several previous interactions with the defendant, observed that the defendant was seated in the driver seat of the Nissan.[1] No other individuals were inside of the car.

When the defendant observed the unmarked police cruiser that Officer Moore and Officer Schemmel were driving, the defendant drove over a curb and began to drive away from their vehicle. Officer Suarez and Officer Johnson then observed the Nissan traveling at a high rate of speed southbound on the 100 block of 42nd Street Northeast, Washington, D.C., with its trunk open. When Officer Suarez and Officer Johnson attempted to conduct a traffic stop of the Nissan by activating their vehicle's emergency equipment, the Nissan proceeded to flee away.

Based on his knowledge of the defendant, Officer Suarez advised members of the CST to canvas for the Nissan around the 5000 block of Bass Place Southeast, Washington, D.C. While canvassing, Officer Webber advised that he observed a vehicle matching the look of the Nissan

---

[1] On June 25, 2025, law enforcement determined the Nissan was stolen out of Laurel, Maryland.

with the trunk opened, turning southbound onto 50th Street Southeast, Washington, D.C. Officer Schemmel and Officer Moore then observed the Nissan on the 200 Block of 51st Street Southeast, Washington, D.C., and further observed the defendant exit the Nissan from the driver door and run away from the location on foot. Officer Schemmel and Officer Moore observed that the defendant was clutching at the right side of his waistband area.

Officer Suarez and Officer Johnson then observed the defendant running on the 5000 block of C Street Southeast, Washington, D.C. Officer Suarez and Officer Johnson exited their police cruiser and pursued the defendant on foot to detain him for fleeing during the traffic encounter. While in pursuit of the defendant, Officer Suarez and Officer Johnson observed him clutching and digging at the right side of his waistband area.



*Figure 1: The Defendant Fleeing Law Enforcement*



*Figure 2: The Defendant Grabbing his Waistband Area While Fleeing*



*Figure 3: The Defendant Trying to Climb Fence Prior to Arrest*

After a brief foot pursuit, Officer Suarez and Officer Johnson detained the defendant in the

rear of 5044 C Street Southeast, Washington, D.C, and he was placed under arrest for fleeing. While the defendant was handcuffed, he actively attempted to conceal the firearm in his pant leg by crossing his legs.



*Figure 4: The Defendant Attempting to Cover the Firearm*

Additionally, when there was only one officer guarding the defendant, he made another attempt to break free from custody and flee the area. The lone officer was able to corral the defendant for long enough, however, that several other law enforcement personnel were able to rush over and prevent his escape.

Officer Moore then patted down the defendant's person and felt what he immediately recognized as a firearm inside of the defendant's right pant leg.



*Figure 5: Bulge in The Defendant's Right Pant Leg*

Officer Moore then removed the item from the defendant's right pant leg, which was a firearm.



*Figure 6: Law Enforcement Seizing the Firearm*

The recovered firearm was a black Glock Model 23, .40 caliber, pistol, with the serial number BHUR903. The firearm was loaded with one round in the chamber and thirteen rounds in a seventeen-round capacity magazine.



*Figure 7: Recovered Firearm*

## II.   <u>PROCEDURAL HISTORY</u>

On July 24, 2025, a one-count complaint was filed against the defendant, which charged him with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year (18 U.S.C. § 922(g)(1)). (ECF No. 1). On July 25, 2025, the United States moved for the defendant to be detained pending trial, and on July 31, 2025, the Court entered an order to that effect. (ECF No. 12). On August 1, 2025, a one-count indictment was filed against the defendant, which charged him with the same offense as alleged in the complaint. (ECF No. 13). The indictment also contained a forfeiture allegation related to, among other things, the Glock Model 23, .40 caliber firearm and associated .40 caliber

ammunition seized from the defendant on the offense date. *Id*. at 2. On December 16, 2025, the defendant pled guilty—pursuant to a plea agreement[2]—to one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year (18 U.S.C. § 922(g)(1)). (ECF No. 24). Sentencing is currently scheduled for April 2, 2026.

On March 24, 2026, the Final Presentence Investigation Report ("PSIR") was filed with the Court. (ECF No. 29). According to the PSR, the defendant's estimated total offense level is 19, his criminal history category is III, and his guideline imprisonment range is 37 months to 46 months. *Id.* at 19. Pursuant to 18 U.S.C. 3583(b)(2), the Court may impose a term of supervised release of not more than 3 years. *Id*.[3]

### III.    <u>LEGAL STANDARD</u>

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

---

[2] As part of the parties' plea agreement, the United States agreed to cap its allocution at the bottom end of the Estimated Sentencing Guidelines range, which is 37 months to 46 months of imprisonment. (ECF No. 24 at 4).

[3] The United States agrees with these calculations.

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
        (i) issued by the Sentencing Commission . . .; and
        (ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –
    (A) issued by the Sentencing Commission . . . and
    (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id*. A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id*. at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court

can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022); s*ee also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## IV.    ARGUMENT

The United States recommends that the Court sentence the defendant to 37 months of imprisonment followed by three years of supervised release. This sentence: (i) reflects the serious nature of the offense; (ii) addresses the defendant's escalating criminal history; (iii) promotes respect for the law; (iv) provides just punishment for the offense; (v) affords adequate deterrence to criminal conduct; and (vi) protects the public from further crimes of the defendant.

### A.  The Nature and Circumstances of the Offense

This event began with the defendant's deliberate refusal to comply with police and escalated from there. When officers attempted a routine traffic stop, the defendant chose to flee. He drove away from police, then ran when officers pursued him on foot, and even attempted to escape again after he was placed in handcuffs. This was sustained, knowing defiance of law enforcement authority at every stage.

When MPD officers finally subdued the defendant, they discovered exactly why he was so determined to escape: he was armed. The defendant carried a loaded Glock pistol concealed on his

person, with one round of ammunition in the chamber, and twelve additional rounds in a twenty-four round extended magazine. In other words, the firearm was not merely possessed—it was ready for immediate use.

The danger posed by the defendant's conduct cannot be overstated. He chose to run through a residential neighborhood in Washington, D.C., while armed with a fully loaded, readily accessible gun. That conduct alone posed an immediate and serious danger to everyone around him. *See United States v. Blackson*, No. 23-CR-25, 2023 WL 1778194, at *7 (D.D.C. Feb. 6, 2023) ("Illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's pants, while out in public, poses an inherent risk of danger to the community."). And such a conclusion is still the case even though the defendant never used the firearm in question. *United States v. Gassaway*, 21-CR-550, 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) ("This Court agrees with other courts in this district that unlawfully carrying a concealed or loaded firearm in public poses a risk of danger to the public."); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence," particularly when the defendant's prior convictions indicate a predilection for violence); *United States v. Howard*, No. 20-mj-181, 2020 WL 5642288, at *3 (D.D.C. Sept. 21, 2020) ("Illegally possessing a concealed firearm in public where other people are congregated, as alleged, poses an inherent risk of danger to the community.").

The defendant's lack of concern for the officers' safety and the public's safety should be alarming to the Court and weighs in favor of the requested sentence.

### B. The Defendant's History and Characteristics

The defendant's criminal history reflects a clear and escalating pattern of unlawful conduct. As he has matured, his crimes have not abated—they have intensified in both seriousness and risk

to the community. For example, the defendant has the following criminal convictions that show a

pattern of escalating criminal conduct:

- In 2017, the defendant pled guilty to shoplifting, and in 2018, he was sentenced to 4 months of probation. (ECF No. 29 at 8).

- In 2020, the defendant pled guilty to unauthorized use of a vehicle and destruction of property and was sentenced to 3 days of probation. *Id.*

- In 2020, the defendant pled guilty to violation of a gun free zone, and in 2021, he was committed to non-restrictive supervision for a period not to exceed 6 months. *Id*. at 9.

- In 2022, the defendant pled guilty to possession of a controlled substance – cocaine (misdemeanor) and was sentenced to 6 months of probation. During his probationary period, the defendant: (i) had a "notice of non-compliance" filed; (ii) failed to appear, resulting in a bench warrant being issued; and (iii) tested positive for cocaine on three separate occasions. *Id*. at 10-11.

- In 2024, the defendant pled guilty to carrying a pistol without a license and was sentenced to 10 months of imprisonment and 3 years of supervised release. *Id*. at 11. In that case, MPD officers stopped an Infiniti for various traffic infractions, and the defendant was sitting in the backseat smoking marijuana. Law enforcement eventually observed a black bag next to where the defendant was positioned, which contained approximately 115 grams of marijuana, a scale, and multiple sandwich bags. *Id*. at 12. The officers also found two firearms in the car that were chamber and magazine loaded. Investigators eventually located what they believed to be the defendant's Instagram account, which appeared to contain pictures of the defendant holding the same firearms as those located during the traffic stop.

Even the prison term he served—and the court's continued leniency—did not deter him.

At the time of the instant offense, the defendant had completed only a fraction of his supervised

release term. Yet he chose to reoffend by actively fleeing from law enforcement while carrying a

loaded firearm. That timing is telling: the defendant committed this offense not after years of law-

abiding conduct, but while still under court supervision, demonstrating a complete disregard for

the Court's authority.

Nor are these convictions isolated. The defendant has also been arrested eight other times

for a range of crimes, including property offenses, firearm offenses, and narcotics offenses. *Id.* at 13-14. Taken together, the defendant's record reflects not aberrational behavior, but a sustained and escalating pattern of criminality.

Importantly, nothing in the defendant's background mitigates this conduct. He had the benefit of a supportive upbringing, along with educational and vocational opportunities. He does not appear to suffer from significant mental health issues that would explain his behavior. While he has a history of substance use, that does not excuse his repeated and deliberate violations of the law—particularly his continued involvement with firearms.

In short, the defendant's history demonstrates that prior leniency has failed. Each successive intervention—probation, supervision, and even incarceration—has been met not with compliance but with escalation. His record shows that he is unwilling to conform his conduct to the law and poses an ongoing danger to the community.

Accordingly, the defendant's history and characteristics support the requested sentence.

## C. The Need for the Sentence Imposed

The requested sentence is sufficient but not greater than necessary to meet the goals of sentencing. Specifically, a sentence of 37 months of imprisonment and 3 years of supervised release will reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence to criminal conduct, and provide just punishment for the defendant's crime. The additional period of supervised release will also help keep the defendant accountable when he concludes his prison term.

## V.    CONCLUSION

For all the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 37 months of incarceration followed by 3 years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    /s/ *Joshua Satter*
JOSHUA SATTER
Assistant United States Attorney
N.Y. Bar No. 5477112
601 D Street NW
Washington, D.C.
(202) 252-7566
Josh.Satter@usdoj.gov